940 F.2d 663
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
James R. GARNER, Defendant-Appellant.
 No. 90-5613.
 United States Court of Appeals, Sixth Circuit.
 Aug. 6, 1991.
 
 Before RALPH B. GUY, Jr. and BOGGS, Circuit Judges, and BERTELSMAN, District Judge.
 PER CURIAM.
 
 
 1
 The defendant, James ("Duck") Garner, appeals his conviction on two counts of conspiracy to possess cocaine with the intent to distribute and one count of actual possession of cocaine with the intent to distribute. Garner makes three assignments of error. Finding them to be without merit, we affirm his conviction.
 
 
 2
 * This case arises out of an investigation by the Tennessee Bureau of Investigation, in cooperation with federal authorities, into James Garner. The government used several informants to convict Garner. The government introduced testimony both from those who claimed to have purchased cocaine from Garner and those who sold it to Garner. Witnesses in the former category included Danny Blankenship, who testified that he had purchased cocaine from Garner for personal use during the year 1986. He denied ever having sold the cocaine. Nonetheless, he did admit that the government had promised him that his testimony would not be used against him. After trial, the prosecutor received an anonymous letter stating that Blankenship was a drug dealer. The letter contained no corroborating details. Also after trial, the defense counsel interviewed Blankenship's ex-wife, to whom he was still married during the trial. She gave a statement saying that the Assistant U.S. Attorney prosecuting Garner had called her on the telephone and threatened him with prosecution if he did not cooperate. There was testimony from others who claimed to have purchased cocaine from Garner for recreational use as well.
 
 
 3
 The most damning evidence, however, came from two witnesses who testified that they sold cocaine to Garner, usually "fronting" him the drug.** Richard Usury and Max Mullins sold Garner cocaine for resale. Usury purchased cocaine in Florida in kilogram and half-kilogram amounts. In early 1986, he contacted James Garner and offered to front him cocaine for resale in Tennessee. Garner agreed. Usury continued to sell cocaine to Garner throughout late 1986 and 1987. Usury ceased doing this when, at the end of 1987, he was apprehended by the authorities. The other informant relied on by the government was Max Mullins--Garner's cousin and "business associate." Like Usury, Mullins operated out of Florida. Also like Usury, Mullins was arrested for drug traficking in Florida. Unlike Usury, however, Mullins faced, at the time of the investigation and trial of Garner, a pending criminal proceeding of his own, which could have resulted in a substantial prison sentence.
 
 
 4
 Because of the leverage that the pending criminal prosecution gave the government, the TBI was able to get Mullins to agree to cooperate in their investigation and prosecution of Garner. Although Mullins did agree to cooperate with the government, he was reluctant to do so because of his close relationship with Garner. Indeed, on direct examination, Mullins claimed that he loved Garner "like a brother," and that cooperating with the government caused him great anguish.
 
 
 5
 He did cooperate, at least at first. At the request of the TBI, Mullins wore a "wire" and, on two occasions, met with Garner. At the first meeting, Garner paid Mullins $5,000 owed for a prior shipment of drugs and the two of them had a conversation that, while somewhat ambiguous, seemed to refer to drugs. At the second meeting, Garner and Mullins discussed the drug business, and Garner groused that sales were slow because some other local dealers were undercutting him.
 
 
 6
 At trial, however, Mullins became more reluctant to testify. Because he was, at the time, facing a pending indictment, the trial court, at the request of the United States, appointed counsel to advise him regarding his rights. During the trial but outside of the presence of the jury, Mullins was told that he could be held in contempt if he refused to testify. Mullins received a grant of immunity for his testimony, both from the United States and the state of Tennessee. Mullins, however, indicated that he didn't want immunity--that he preferred to invoke his fifth amendment rights.
 
 
 7
 When Mullins was called to the stand, he evinced a very uncooperative attitude. Rather than answer the government's questions, Mullins indicated that he wanted to make a statement. The court informed him, in the presence of the jury, that he could be held in contempt if he failed to testify, that he had no fifth amendment rights to invoke, since he had been given a grant of immunity, and that the witness stand is a place from which one answers questions, not makes statements. Mullins seemed impervious to this line of argument, and, after answering a few questions, again became uncooperative. At this point, the court excused the jury, after which Garner asked for a mistrial, arguing that the atmosphere of the courtroom had been seriously tainted.
 
 
 8
 The court than allowed the prosecution to conduct a voir dire examination of Mullins. Mullins was willing, with some cajoling, outside of the presence of the jury, to tell everything--including that he had sold drugs to Garner. Defense counsel asked Mullins one question at the voir dire, which Mullins did answer. Again, the jury was brought back in, and again, Mullins was uncooperative. He again answered a few questions but attempted to invoke his fifth amendment rights on the main question--whether he had actually sold cocaine to Garner. Mullins was willing to identify the voices on the tape as being his and the defendant's. Mullins was held in contempt three times. Nonetheless, the defendant had the opportunity to cross-examine Mullins, and Mullins did answer his questions on cross-examination.
 
 
 9
 After it had already rested its case, the government asked to read the voir dire transcript into evidence. It did so over the strong objection of the defense counsel. At that point, the defense counsel did not ask to have the opportunity for additional cross-examination.
 
 
 10
 Finally, during the course of the trial, one of the jurors informed a U.S. Marshal that another juror had been threatened. The juror who was threatened indicated that some young men (whom she took to be family members of the defendant) were standing outside of the courtroom during a break in the testimony. She indicated that one of the young men had made a noise like a gunshot. On questioning, however, the juror stated that she did not take the incident seriously and that it would not affect her judgment about the case.
 
 II
 
 11
 Garner claims that admitting Mullins's testimony from the voir dire violated his rights under the Confrontation Clause and that admitting in the evidence violated the Federal Rules of Evidence. It is clear that the court did not violate the Rules of Evidence. Fed.R.Evid. 804(b)(1) allows testimony given at a separate hearing under oath to be used where the witness is not "available." Fed.R.Evid. 804(a)(2) defines a witness who persistently refuses to testify as being "unavailable" for purposes of the hearsay rule.
 
 
 12
 In Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2351 (1980), the Supreme Court explained that the Confrontation Clause allows certain uses of hearsay when a witness is not available for trial. However, it does limit the use of such evidence in two ways Id. at 64, 100 S.Ct. at 2358. First, according to the Court, the Confrontation Clause "establishes a rule of necessity." Ibid. thus, the government "must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant. Ibid. In this case, we think that the witness's unavailability was evident to all. Second, the testimony of the witness must bear "indicia of reliability." Id. at 66, 100 S.Ct. at 2539. The classic indicia is cross-examination. See id. at 70, 100 S.Ct. at 2541. Here, the defendant had the opportunity to cross-examine the witness both at the voir dire and during his actual testimony. If the defendant had asked for permission to put additional questions to the Mullins after the introduction of his voir dire testimony, and the judge had refused, or, alternatively, if the court had agreed to allow additional examination but Mullins had himself refused at that point, Garner might have an argument. But Garner didn't ask the court for additional cross-examination.
 
 III
 
 13
 Garner's second assignment of error is that the trial court should have granted his request for a mistrial after the evidence of his "threat" to the juror was introduced. He argues that the government had the burden of proving that the jury was not tainted. At one time, this was the rule. It is the rule no longer. The key case from our circuit on this issue is United States v. Pennell, 737 F.2d 521 (6th Cir.1984). As we recently summarized:
 
 
 14
 Four points emerge from our decision in Pennell: (1) when a defendant alleges that an unauthorized contact with a juror has tainted a trial, a hearing must be held; (2) presumption of prejudice arises from such a contact; (3) the defendant bears the burden of proving actual juror bias; and (4) juror testimony at the "Remmer hearing" is not inherently suspect.
 
 
 15
 United States v. Zelinka, 862 F.2d 92, 95-96 (6th Cir.1988). Applying these principles to our facts, we believe that Garner failed to prove juror bias. When the court learned of the incident, the judge called two jurors--the one to whom the "threat" had been directed and the one who reported the incident--into his chambers. Neither disclosed any bias. The trial court indicated a willingness to question all of the jurors, but the defendant refused. There is no evidence on the record suggesting actual bias on the part of the jurors, and, under Pennell and its progeny, we cannot presume such bias.
 
 IV
 
 16
 Last, Garner suggests that the trial court should have granted a new trial based on newly discovered "evidence"--the anonymous letter and the statement from Blankenship's wife regarding the witness, Danny Blankenship. We do not believe that either of the bits of evidence to which the defendant points to are sufficient to mandate a new trial. As we have explained:
 
 
 17
 In making a motion for a new trial based on newly discovered evidence, the defendant must show that the evidence (1) was discovered only after trial, (2) could not have been discovered earlier with due diligence, (3) is material and not merely cumulative or impeaching, and (4) would likely produce an acquittal if the case were retried.
 
 
 18
 United States v. Barlow, 693 F.2d 954, 966 (6th Cir.1982), cert. denied, 461 U.S. 945 (1983). We do not believe that either the anonymous letter or the statement from Blankenship's former wife meets this requirement. The anonymous letter indicates, contrary to Blankenship's representations, that he sold drugs. This, however, fails to meet requirement (3) in two respects. First, the evidence--if you can call an anonymous letter evidence--is cumulative. Several of the government's own witnesses testified that Blankenship sold them drugs. Garner was quite free to comment on this testimony in arguing about Blankenship's credibility to the jury. Additionally, it is merely impeaching. The statement from his wife, like the letter, is merely impeaching. This also fails to meet requirement (2), in that it would have been discovered had the attorney exercised due diligence.
 
 
 19
 We doubt, moreover, that either bit of "evidence" would have been likely to result in an acquittal, even if available for trial. It is highly unlikely that the letter would even have been admitted, and, in any event, the jury was well aware that Blankenship sold (relatively small) quantities of cocaine. If anything, this might have helped the government's case, as it corroborates Blankenship's story that he got drugs from Garner. The statement from Blankenship's former wife also adds little. The jury knew that Blankenship made a deal that his testimony wouldn't be used against him; he testified to that effect. Although Garner mentions the possibility of "secret deals," there is no evidence to that effect in the record.
 
 V
 
 20
 Garner's conviction is, therefore, AFFIRMED.
 
 
 
 *
 The Honorable William O. Bertelsman, United States District Court for the Eastern District of Kentucky, sitting by designation
 
 
 **
 "Fronting" cocaine is a practice in the drug trade similar to a common practice in other retail businesses whereby a wholesaler sells a drug to the retail dealer on credit, after which the retailer uses the proceeds to pay for the drug. This is obviously necessary if the retailer lacks start-up capital