**UNITED STATES of America,**
**Plaintiff,**

**v.**

**Wilfredo ROSARIO–CAMACHO [4], Luis Rodriguez–Sostre [5], Josue Perez–Mercado [10], Ramon Maysonet–Soler [14], Jose Negron–Sostre [18], Defendants.**

**Criminal No. 08–310 (FAB).**

United States District Court,
D. Puerto Rico.

Feb. 16, 2010.

---

228

Francisco M. Dolz–Sanchez, Francisco M. Dolz Law Office, Mariangela Tirado–Vales, Mariangela Tirado Vales Law Office, Miriam R. Ramos–Grateroles, Miriam Ramos Grateroles, San Juan, PR, for Defendants.

### SEALED MEMORANDUM AND ORDER

BESOSA, District Judge.

Before the Court are two motions: defendant Ramon Maysonet–Soler's ("Maysonet") Motion for New Trial (Docket No. 2192) and the remaining four defendants' (Wilfredo Rosario–Camacho, Luis Rodriguez–Sostre, Josue Perez–Mercado and Jose Negron–Sostre) Motion for Mistrial. (Docket No. 2193) Both motions are based primarily [1] on allegations that the jury is

---

1. Both motions also raise allegations of prejudice unrelated to the issue of jury contamination. Maysonet raises an attorney-client privilege violation which the Court **DENIES** without prejudice (*See* Docket No. 2192 at 1–2). Maysonet also alleges that because a government witness, Alfredo Sierra–Garcia ("Sierra"), is "an admitted convicted felon" who testified that he knew Maysonet's family and identified Maysonet's mother in the courtroom, his testimony "caused great prejudice" to the defendants because "it tied the defendants [sic] family, particularly Mr. Ramon

Maysonet–Soler's family, with criminal acts." (*Id.* at 3–4; Transcript of Jury Trial, Afternoon Session, February 1, 2010 at 71.) In their Motion for Mistrial, the four other defendants also argue that Sierra's in-court identification of Maysonet's mother caused them prejudice.

The Court **DENIES** Maysonet's motion for new trial and the remaining four defendants' motion for mistrial on this ground of prejudice. The defendants already objected to the witness's identification of Maysonet's mother

biased and/or contaminated and will therefore be unable to render an impartial verdict. The claim of jury contamination stems from two alleged incidents: first, defendant Maysonet's wife claims she overheard three members of the jury discussing the case outside of the courthouse while they (the three members of the jury) were smoking cigarettes after trial recessed for the day; second, two members of the jury claim that members of defendants' families stared and laughed at the two jurors in the federal building cafeteria in a manner causing discomfort to the two jurors.

Defendants' motions claim that these two incidents, and the possibility that all or many of the jurors are aware of one or both of the incidents, have tainted the jury such that the defendants no longer have the benefit of an impartial jury. The Court **DENIED** both motions[2] in open court on February 4, 2010, and enacted prophylactic measures, discussed below in greater detail, to protect the jury's integrity throughout the remainder of the trial.

Those rulings were based on trial testimony and hearings pertaining to the issue of jury contamination, the oral and written motions and arguments made by all parties[3], the Court's interviews with members of the jury, and the Court's independent legal analysis, as follows.

## FACTUAL AND PROCEDURAL BACKGROUND

The Court recounts only the facts necessary for the purposes of resolving the pending motions. In compiling the facts, the Court draws on the facts presented in the briefs submitted on this issue by the parties, on the record contained in the docket, and on the Court's own notes and observations.

### I. First Incident: "The Smoking Incident"

On January 25, 2010, counsel for defendant Maysonet, Alexander Zeno, informed the Court that Maysonet's wife, Suheil Rosa ("Rosa"), overheard three members of the jury discussing this case while smoking cigarettes outside of the main entrance to the federal building and courthouse on Thursday, January 21, 2010.[4] Specifically, Maysonet's wife claimed she overheard the jurors mention the names "Omar" and "Tito," allegedly the names, nicknames, or aliases of two defendants in

during trial (*Id.* at 71). In an extensive sidebar discussion (*Id.* at 71–74.), the Court heard from all parties regarding the objection. The defendants argued that the witness's identification of Maysonet's mother was embarrassing to her (the mother), prejudicial to the defendants, and irrelevant to the government's theory of the case. (*Id.*) The government argued that the in-court identification laid a foundation for the witness's testimony regarding his knowledge about the defendant, the defendant's family, and where the family and the defendant lived, and also went to the witness's credibility regarding the given testimony. (*Id.*) The Court overruled the objection, and offered to give the jury a limiting instruction concerning their consideration of the in-court identification of Maysonet's

mother, but the defendants objected to the instruction, arguing that the proposed limiting instruction would add to the witness's credibility. (*Id.*) The parties have raised no new arguments, rhetorical or legal, regarding the in-court identification; thus the objection to the in-court identification of Maysonet's mother remains **OVERRULED.**

2. To the extent any request was made to dismiss any of the jurors, the Court **DENIED** that request also.

3. Docket Nos. 2093, 2192, 2193, 2194.

4. Defendant Maysonet's motion (Docket No. 2093) incorrectly cites the date of the incident as January 22, 2010.

this case.[5] The Court informed all parties about Rosa's claim, then held an evidentiary hearing on the request of defendant Maysonet (Docket No. 2093) outside of the jury's presence in which both Maysonet's wife and the Court's Security Officer ("CSO") testified under oath. The Court also interviewed in chambers and in the presence of the attorneys for all parties each member of the jury identified by Rosa as well as one other juror mistakenly identified by Rosa.[6]

## A. January 25, 2010 Evidentiary Hearing

At the evidentiary hearing on the morning of January 25, 2010, Rosa testified that she overheard three members of the jury discuss the case on January 21, 2010, while smoking outside the front entrance of the federal building and courthouse, and that she heard the jurors mention the names "Tito" and "Omar." The CSO testified that he had taken the jury out through the employee door to the federal building, not the main entrance, and that it was his impression that none of the jurors smoked because none had thus far requested a cigarette break and the CSO did not see any of the jurors with cigarettes (*Tran-*

*script,* Jury Trial, January 25, morning session at 15).

Following testimony, the Court ordered the United States Marshal to obtain any videotape taken by security cameras located at the main entrance to the federal building and courthouse on the date and time in question. (*See Transcript,* January 25, morning session at 19.)[7] Maysonet's attorney, on whose request the evidentiary hearing was conducted, stated he had "no problems with going forward with the case, I mean, until we get the tapes so we don't waste time." *Id.* at 20. Maysonet's attorney told the Court, "No need to stop now" because "[i]f something happens, then we can do something later." *Id.* at 20. Nevertheless, during a sidebar conference after the conclusion of the hearing and the jury's return to the courtroom, defendants Rosario–Camacho, Rodriguez–Sostre, Perez–Mercado and Negron–Sostre moved to continue the trial pending resolution of the jury contamination issue (*Id.* at 23).

The Court then ordered the jury to return to the courtroom so that Rosa could identify the three members of the jury she saw talking outside the main entrance by marking their positions on a seating chart of the jury provided to her by the Court. (Docket No. 2114, Exh. 1[8]) The Court

---

**5.** Defendant Rosario–Camacho allegedly uses the alias "Tito," and defendant Rodriguez–Sostre allegedly uses the alias "Omar." The Court notes for the record that one of the jurors also goes by one of these two names (*Transcript,* Jury Trial, January 25, morning session at 16).

**6.** The Court called into chambers the three members of the jury identified by Rosa as the smokers she overheard discussing the case on January 21, 2010. It quickly became clear that Rosa had incorrectly identified one of the three smokers, but two of the interviewed jury members admitted being the smokers at the time and date in question and were able to identify the third smoker, whom the Court then called.

**7.** The Marshal does not have a camera at the entrance to the federal building. The Homeland Security Department may have cameras there, and the Court will review any video taken if any exist and secure them if necessary. The Court believes that viewing the video may not be necessary if the video has no sound. It is undisputed that the three jurors were smoking at the entrance to the building and that Rosa was present there, also. The only disputed issue is whether the jurors were talking about the case, including mentioning the names "Tito" and "Omar."

**8.** The Exhibit now preserved for the record includes the names of the selected jurors for the Court's clarification. When the seating chart was provided to Rosa, it contained only

explained to Rosa, "Once the jury comes in, I'm going to call a bench conference, and we'll discuss some matter so that they don't feel like they're sitting there like lumps on a log." (*Transcript,* January 25, morning session at 26.) Rosa indicated that she was unable to see the jurors clearly from the side of the courtroom behind the prosecutors' table where she and other family members normally were seated, and asked if she could move to the seating area behind the defendants' table to view the jury better. The Court indicated that Rosa could move to that side of the courtroom, which she did, and that she could stand if necessary to view the jury, which she did also. Once the jury was seated in the jury box, Rosa identified three jurors on the seating chart. While Rosa identified the jurors, the proceedings appeared to continue as normal, to avoid calling undue attention to Rosa's actions. The Court dismissed the jury and proceeded to chambers to conduct *voir dire* with each identified juror.

### B. January 25, 2010 *Voir Dire* Proceedings

The Court questioned each identified juror in the presence of all attorneys, in chambers, and on the record, regarding the smoking incident. Juror 43, the first juror questioned by the Court, stated, *inter alia,* that the CSO took the jurors "together, as a group" out of the employee exit of the federal building following the close of trial proceedings on Thursday, January 21, that he/she does not smoke, and that no fellow jurors ever discussed the case with him/her. (*Transcript, Voir Dire* Proceedings, January 25, 2010 at 1–4)

The next identified juror, Juror 31, stated, *inter alia,* that he/she smokes, that

he/she exited the main exit of the federal building and courthouse to smoke one cigarette with two other jurors on the Thursday in question,[9] and that the smokers discussed the temperatures in the courthouse and the best route to get from the courthouse to the parking lot. *Id.* at 5–8. Juror 31 specifically stated that no mention was made of the names "Omar" or "Tito" and that there was no discussion of the case whatsoever. *Id.*

The Court next questioned Juror 33, who stated, *inter alia,* that he/she exited the courthouse from the front of the courthouse on the date in question, then he/she stopped to smoke with Juror 31 and 30, that no one discussed the case, and that all the smokers discussed was how cold the jury room was and how to get to the courthouse the following week. Juror 33 also specifically stated that no mention was made either of "Omar" or "Tito." *Id.* at 9–11.

The Court decided to also interview Juror 30 because both Juror 31 and Juror 33 recalled Juror 30 as the third smoker outside of the courthouse on Thursday, January 21, 2010. Juror 30 stated that, *inter alia,* he/she exited from the front of the courthouse with Juror 31 and Juror 33 on the Thursday in question, that he/she stopped to smoke, that they discussed the temperature of the jury room, and that no discussion of the case occurred. *Id.* at 11–13.

The Court warned each juror called in for questioning that he/she was not to discuss with anyone his/her conversation with the Court during the *voir dire.* The Court also confirmed with each juror that

---

the numbers of the jurors and their positions in the jury box relative to each other.

**9.** To protect the identity of the jurors, those jurors are referred to by number, as Juror 30 and Juror 33.

he/she was unable to hear any of the sidebar conference during trial.

### C. Trial Proceedings Following *Voir Dire*

After a short recess, regular trial proceedings continued. Maysonet moved for mistrial and, in the alternative, for replacement of the CSO on the grounds that the CSO's testimony stating that the jury left together via the employee exit was false. (*Transcript*, Jury Trial, Day Three, January 25, 2010 at 3–4) All remaining defendants only joined the motion for mistrial. (*Id.* at 4–5.) The Court denied both the motion for mistrial and the motion to replace the CSO. The Court found that the CSO was unaware that some members of the jury had exited the courthouse separately from the others. Nevertheless, the Court informed all parties that, henceforth, the jury would no longer enter and exit through the main entrance of the federal building and courthouse and that the CSO would take smokers somewhere else (not the smoking area in front of the main entrance) to smoke. (*Id.* at 6.)

### II. Second Incident: "The Cafeteria Incident"

On February 2, 2010, the Court learned of an incident allegedly involving two members [10] of the sixteen-member jury impaneled for the trial currently in progress.

Two members of the jury, Juror 31 [11] and Juror 6, notified the CSO of an incident they allegedly experienced during their lunch break earlier that day. The CSO told the Court that the two jurors experienced an uncomfortable situation while having their lunch in the cafeteria [12]; the two jurors noticed who they believed were relatives of the defendants [13], seated at a nearby table in the cafeteria, staring at them (the two jurors) and laughing when they (the jurors) got up from their table to leave. The jurors allegedly told the CSO that the stares and laughter of those individuals in the cafeteria made them feel uncomfortable and somewhat threatened. Upon learning of the jurors' allegations from the CSO, the Court informed counsel for both parties, then conducted a *voir dire* proceeding with each juror involved in the incident, one at a time, in chambers and on the record, without attorneys present.

### A. February 2, 2010 *Voir Dire* Proceedings

The Court first asked Juror 31 to describe the incident. Juror 31 told the Court during *voir dire* that he/she was sitting with another juror, Juror 6,[14] at a table in the courthouse cafeteria (*Transcript, Voir Dire*, February 2, 2010 at 3). Nearby were three or four "family members of the defendants," all women (*Id.* at 3–9). Juror 31 told the Court that the

---

10. There are twelve members of the jury and four alternate jurors.

11. Juror 31 was one of the members of the jury accused of discussing the case in the smoking incident described above.

12. The cafeteria is located in a federal building connected to the courthouse where the trial in this case is currently being held.

13. The jurors believed the individuals staring and laughing at them to be defendants' family members. Whether or not the individual were, in fact, defendants' family members is

irrelevant to the Court's determination of jury contamination; the perceptions and beliefs held by the jurors, and whether those beliefs and perceptions create the possibility of impermissible jury bias or otherwise render those jurors incompetent to reach an impartial verdict, guide the Court's decision.

14. During *voir dire* Juror 31 referenced the lunch partner by name; this Court will continue to protect the names of jurors, however, and refer to the jurors only by their numbers.

three women were staring at them (the two jurors) for "like more than a minute" and that, when the jurors were leaving the cafeteria, "they were laughing." *Id.* at 4.

The Court next inquired as to how the conduct of the three family members made Juror 31 feel. Juror 31 said he/she did not pay any attention to the women, and explained, "I'm not scared, but I don't want any trouble." *Id.* When the Court asked Juror 31 specifically if he/she felt threatened, Juror 31 said, "sort of," then clarified that he/she felt more uncomfortable than threatened. *Id.*

When the Court asked Juror 31 whether he/she mentioned the incident to any other juror, Juror 31 stated, "when we talked with [the CSO], we was [sic] talking in the hallway and there were other jurors, maybe they heard something." *Id.* at 5.

The Court concluded by delving into Juror 31's ability to remain impartial. Juror 31 stated he/she could continue to be impartial. The Court asked again, "Are you sure you can be impartial," to which Juror 31 responded, "Yeah, I just don't want any trouble because she was the one who—who said that I was talking about the case at first ... when I was smoking, so I don't want her to bring it up first, then I ... So that's why I told [the CSO]." *Id.*

Juror 6 described the same incident to the Court during his/her *voir dire*. Juror 6 identified one of the three family members in the cafeteria as "the wife of one of the men." *Id.* at 6. The Court asked Juror 6 how he/she knew that one of the family members in the cafeteria was the wife of a defendant. Juror 6 explained, "Because that's the one that—that had the problem with the three persons, that they were smoking." *Id.* at 7. In describing the incident, Juror 6 also told the Court, that they (the two jurors) did "not talk anything about the case, anything." *Id.* at 7. When asked whether he/she told anyone else

about the incident, Juror 6 told the Court that only Juror 31 and the CSO heard about the incident. *Id.*

The Court delved into whether Juror 6 felt threatened. Juror 6 said, "Yeah, a little bit, because we are, like, taking out lunch, and they was—looking at us."

The Court asked Juror 6 whether he/she "can still be impartial in this case," to which Juror 6 responded, "Yeah, I can do it." *Id.* The Court again asked, "You can do it?" *Id.* Juror 6 affirmed, again, "yes." *Id.* At the end of the *voir dire*, the Court asked Juror 6 for a third time whether he/she could be impartial to which Juror 6 again responded in the affirmative. *Id.* at 8.

**B. Trial Proceedings Following February 2, 2010 *Voir Dire* Proceedings**

During trial on the morning of February 3, 2010, absent the jury, the Court held a discussion with all parties regarding the allegations of Jurors 6 and 31. The Court granted motions made by both the government and defendants requesting that the sealed transcript of the February 2, 2010 *voir dire* be provided to counsel for their inspection and requesting that the questions put to jurors be again put to those jurors in front of counsel in order for counsel to examine the jurors' demeanor during questioning. (*See Transcript* Feb. 2, 2010 at 3–5.)

Following a break during which counsel for the defendants reviewed the *voir dire* transcript, the defendants expressed concern that the jury was tainted, that the Court's *voir dire* questions were leading, and that the jury was unable to keep from discussing aspects of the case amongst themselves, including the content of the *voir dire* discussion held on February 2, 2010 and the first *voir dire* discussion, held

on January 25, 2010 (see above). Defendants moved for a mistrial based on jury contamination.

Before ruling on the defendants' motion for mistrial, the Court first decided to hold the requested *voir dire,* this time interviewing each and every member of the jury, including alternates, in the presence of the attorneys of all parties, leaving until last the two members of the jury involved in the cafeteria, to discover what, if anything, the other jurors may have heard about either incident.

### C. February 3, 2010 *Voir Dire* Proceedings

During the February 3, 2010 *voir dire* proceedings, the Court asked each jury member who was not involved with the cafeteria incident, *inter alia:* (1) whether he/she was in the cafeteria the prior day, on February 2, 2010; (2) whether he/she noticed, heard about, knew about, saw or perceived anything occur between members of the jury and individuals who have been present in the courtroom during the trial; (3) whether he/she has heard about or whether anyone mentioned to him/her anything about an incident in the cafeteria involving members of the jury and individuals who have been present in the courtroom; (4) whether he/she has heard about or whether anyone mentioned to him/her anything about an incident involving fellow jurors who smoke and people who have been in the courtroom; (5) whether he/she was able to decide the case solely on the evidence presented and not on anything he/she has or will see, hear, or perceive outside the four walls of the courtroom; and (6) whether he/she can be completely impartial during deliberations and when rendering a verdict.

The Court also warned each juror, including those involved in the cafeteria incident, that he/she must not mention anything discussed with the Court in chambers with any fellow juror.

Upon the suggestion of Ms. Tirado-Vales, defense counsel for defendant Rodriguez-Sostre, the Court and attorneys decided that, following the questioning of each juror, the Court would excuse the juror, then hear any requests from the attorneys for additional questions to be put to the juror. Where appropriate, the Court would then recall the juror for follow-up questioning.

### 1. Jury Awareness of Cafeteria Incident

Only three members of the jury who were not involved in the cafeteria incident expressed any awareness about the incident: 4, 27, and 48. (*See Transcript,* Sealed In Camera *Voir Dire,* February 3, 2010.) The level of awareness or interest of those non-involved jurors varied greatly.

*Juror 4*

Juror 4, who was seated near the area where the family members were seated in the cafeteria the previous day, noticed that members of the family "were laughing" when "they left." *Id.* at 10–11. When asked whether he/she perceived anything in particular about that laugh, Juror 4 said no. *Id.*

*Juror 27*

Juror 27 said he/she overheard from a jury member directly involved in the cafeteria incident "something about giving them a bad look or something," or "a laugh." *Id.* at 15. When pressed by the Court to explain further, Juror 27 said he overheard this information in the jury room. *Id.* at 16. He/she told the Court that he/she was "not sure" if everyone heard, but that it was "possible." *Id.*

*Juror 48*

Juror 48 appeared the most aware of or interested in the incident and insisted on

having a translator present to express his/her views about it more fully.[15] Through a court translator, Juror 48 said he/she was aware of the cafeteria incident. He/she told the Court that he/she himself/herself asked the jurors involved in the cafeteria incident why they looked concerned and pressed them to tell him/her what was going on. *Id.* at 58–59. Juror 48 said those jurors told him/her that "Wilfredo's wife" stared at them unpleasantly. *Id.* at 59. Juror 48 also indicated discussing with those two jurors whether it was a good idea for the jurors to state what they did for a living and where they (the jurors) lived in front of the family because whenever the jury leaves after trial, the family looks at the jury in a threatening manner. *Id.* Juror 48 explained her belief that the body language [16] of the defendants' family members was meant to exercise pressure, a pressure that he/she had felt. *Id.* at 60.

When the Court asked Juror 48, "Do you think this pressure will prevent you from considering all the evidence in the case and only the evidence in the case and reach a—an impartial verdict in this case?" he/she answered, "No, no, I feel I can do that." *Id.* Juror 48 again confirmed that he/she could continue to be impartial notwithstanding his/her impressions of the family members' body language because he/she found the attitudes of the family members "amusing." *Id.*

### Jurors 6 and 31

Both jurors involved in the cafeteria incident, 6 and 31, were called in for ques-

tioning despite having been questioned previously during the Court's initial *voir dire* without attorneys present the prior day, February 2, 2010. Juror 6 told the Court he/she did not mention the incident in the cafeteria to any other jurors nor did he/she overhear any other jurors mention the incident. *Id.* at 79. When asked if he/she ever noticed family members looking at him/her outside the courthouse or while driving, Juror 6 responded, "No." *Id.* at 80.

Juror 31, who was involved in both the cafeteria and the smoking incidents, was asked if he/she mentioned the cafeteria incident to any fellow jurors. *Id.* at 88. Juror 31 explained that he/she and Juror 6 initially informed the CSO of the incident in the hallway outside the jury room and "there were other jurors, they heard." *Id.* at 88. Specially, Juror 31 recalled that juror 48 and juror 30 were in the hallway at that time. Since that initial conversation with the CSO, Juror 31 stated that he/she had not mentioned the incident with any fellow juror, except that, en route to the *voir dire* itself (the *voir dire* in progress at the time), Juror 31 encountered Juror 48 who asked Juror 31 what happened. Juror 31 told Juror 48, "Oh, beware, don't look at the family, beware," because Juror 48, "was telling me [he/she] had problems with people staring at her too." *Id.* at 89. When asked, Juror 31 twice confirmed that he/she would be impartial during deliberations and when rendering a verdict. *Id.* at 91.

---

**15.** The Court found that Juror 48's testimony amplified events to make the most dramatic story possible in the telling. During his/her interview, Juror 48 insisted upon speaking to the Court only in Spanish, despite having very advanced English language skills compared to other jurors, all of whom communicated with the Court in English during their *voir dire* proceedings. Juror 48 appeared to relish the *opportunity to "gossip" and to be privy to gossip, and even admitted asking the jurors involved in the cafeteria incident to discuss the incident.

**16.** When later recalled to clarify what he/she meant by intimidating body language, Juror 48 demonstrated physically to the Court and the attorneys: crossed arms, swinging upper body, staring, and tapping of the foot. *Id.* at 66.

The Court recalled Juror 31 to ask if he/she ever noticed any of the people who watch the trial ever staring at him/her while in the car or outside of the courthouse. *Id.* at 93. Juror 31 said that nothing like this had occurred. *Id.*

*All Remaining Jurors*

Jurors 57, 49, 29, 28, 9, 62, 61, 43, 37, 33, and 30 all told the Court they had no awareness of any incident in the cafeteria on February 2, 2010.

## 2. Jury Awareness of Smoking Incident

Only five members of the jury who were not involved in the smoking incident itself expressed any awareness about the smoking incident: 28, 49, 48, 6, and 43. (*See Transcript,* Sealed In Camera *Voir Dire,* February 3, 2010.) Again, the level of both awareness and interest appeared to vary greatly among those jurors.

*Juror 28*

Juror 28 heard from Juror 31 that "somebody said that they seen somebody smoking in the smoking area and talking about the case." *Id.* at 22. The Court asked, "Having heard that from this fellow juror of yours, do you think you can decide this case strictly on the evidence presented within the four walls of the courtroom and not considering anything else that you have heard including this, about the smoking incident?" *Id.* Juror 28 responded, "yes," then, upon the Court's confirmation, "You can do that?", the Juror again affirmed, "Yes, I could." Juror 28 also stat-

ed he/she could be impartial in deliberations and in reaching a verdict. *Id.* at 23.

The Court recalled Juror 28 to inquire whether others were around when Juror 31 told him/her about the smoking incident. Juror 28 did not recall who else was nearby, but believed he/she learned of the incident from Juror 31 while in the jury room. *Id.* at 24.

*Juror 49*

When questioned as to his/her knowledge, if any, about the smoking incident, Juror 49 stated, "the three that were smoking, yeah, they said they stayed and they smoked, but they said that nothing really happened." *Id.* at 31. When the Court asked whether the smokers had told Juror 48 of their (the smokers') conversation in chambers, Juror 48 said, "No, but I saw when they left . . . when they called them . . . So I imagine it was—because I saw them when they stayed . . . when we left, we all left at the same time . . . they stayed back and said we're going to smoke and then leave." *Id.* at 31. The Court then inquired, "Did they mention anything about having an incident with someone, or someones, who have been in court during the trial?" *Id.* Juror 48 responded, "No, not at all." *Id.*

*Juror 48*

Juror 48 told the Court that two of the jurors involved in the smoking incident told Juror 48 about it. *Id.* at 61. Juror 48 said he/she was told that "Wilfredo's wife was accusing them of talking about the case." [17] *Id.* The Court asked Juror 48

---

**17.** Wilfredo is the first name of defendant Rosario–Camacho. It was actually the wife of defendant *Maysonet* who accused three jurors of inappropriately talking about the case. When recalled to explain his/her basis for believing it was "Wilfredo's wife" who was involved in the smoking incident, Juror 48 said that one day in court during trial the woman to which Juror 48 was referring acted

affectionately, "more affectionate than like a brother," with the defendant Wilfredo Rosario–Camacho, and that one day that same woman carried Rosario–Camacho's clothing to him in the courthouse. *Id.* at 67. Juror 48 said that it was just his/her perception that the woman was Wilfredo's wife, and that, while the woman could be a sister, "to me, it's the wife." *Id.*

whether what he/she knew about the smoking incident would influence his/her ability to remain impartial when deliberating or rendering a verdict, Juror 48 responded, "Absolutely not." *Id.* at 62.

### Juror 6

Juror 6, one of the jurors involved in the cafeteria incident, denied having knowledge about the smoking incident. The Court then recalled Juror 6 to clarify whether he/she had knowledge of the smoking incident because, during Juror 6's interview with the Court the prior day, Juror 6 had told the Court that he/she knew one of the family members in the cafeteria was a defendant's wife because "that's the one that had the problem with the three persons, that they were smoking?" *Id.* at 83. Upon recalling Juror 6, the Court asked, "How did you hear about the smoking incident?", to which Juror 6 explained that he/she did not hear about the incident; he/she knew about the incident because he/she was picked up on the day of the smoking incident in front of the courthouse and saw the three jurors smoking, saw the family member nearby the smokers, then saw that same family member sitting on the side of the courtroom other than the side where she usually sat. *Id.* at 84. Juror 6 said, because of all of those things, "I imagine that—that is the wife of one of those [defendants]," and that "I imagined that that's the wife because she was sitting in the side of the—of the accused—of the defense." *Id.*

### Juror 43

Juror 43 was the juror mistakenly identified by Rosa as one of the three smokers outside of the courthouse on January 21, 2010. Although he is not a smoker, he was called as a result of the misidentification for *voir dire* proceedings in chambers on January 25, 2010 as described above. During the February 3, 2010 *voir dire,* the Court asked Juror 43 whether, following his/her January 25 discussion with the Court in chambers, Juror 43 heard anyone mention the smoking incident. Juror 43 said, "We talk about why I have been called because I was not the person who was smoking," and, when pressed to expand by the Court, said, "That's all." *Id.* at 96–97. Juror 43 said no one discussed what happened outside the courtroom. *Id.* at 97.

### Jurors 30, 31 and 33

To learn more about the jury awareness about the smoking incident, the three jurors involved in the smoking incident were extensively questioned about whether they had spoken with anyone about the incident or about the January 25 *voir dire* proceedings in chambers.

The Court asked Juror 31, who was directly in involved in both incidents, whether he/she has spoken to anyone about the smoking incident since it happened or whether he/she heard anyone mention the incident. *Id.* at 89. Juror 31 stated that he/she did not mention the incident, but that, "I know people know because when we were at the room, [the CSO] came in and he asked who smoke? And well, I say I smoke and the other two that smoke, say, ah—everybody said, ah, something happened with that." *Id.* at 89–90. The Court asked Juror 31, "But that's it?", and, "It's just because [the CSO] asked who smoked?" *Id.* at 90. Juror 31 stated that was it, and that the CSO "left with a face, so everybody knew something was going on." *Id.* Juror 31 also stated, "I heard some people saying, ah, maybe somebody is looking at you when you smoke and tried to make trouble." *Id.*

After discussing Juror 31's testimony, the Court recalled Juror 31 to ask, "What do you mean by tried to make trouble?" *Id.* at 103. In response to this and other follow-up questions, Juror 31 explained,

"Like, I don't know ... trouble like— make—say something that is false, or something ... Like what had happened ... That they were saying I was talking about the case, and I wasn't ... Like somebody from the family said I was talking about the case ... they were saying that I was talking about the case and I wasn't ... For me, that's trouble ... Because I wasn't talking about the case, and then I have to come here and say no." *Id.*

When Juror 30 was interviewed, he/she stated that he/she did not mention the incident to any fellow jurors, nor had he/she overheard any mention of the incident by any jurors. *Id.* at 45. Juror 33 also stated that he/she did not mention either the incident or the January 24 *voir dire* proceedings. *Id.* at 75. Juror 33 was recalled and asked whether he/she overheard any juror mention the smoking incident. The juror responded that he/she had not. *Id.* at 77.

Jurors 37, 61, 62, 4, 9, 27, 29, and 57 all told the Court that they were unaware of any smoking incident.

### 3. Ability of Jury to Decide on the Evidence and Impartiality

When directly asked, each juror and alternate stated clearly that he or she would be able to decide the case based only on evidence presented within the four walls of the courtroom, on nothing seen, heard, or perceived outside of those four walls, and that he or she was able to render an impartial verdict. The Court pressed those who expressed any sort of awareness of either incident, whether through first or second-hand knowledge, inquiring sometimes two or three times whether those jurors were absolutely sure they could remain impartial. All of those jurors con-firmed their ability to base deliberations solely on the evidence and to reach a verdict impartially.

### LEGAL STANDARDS

■ "When a non-frivolous suggestion is made that a jury may be biased or tainted by some incident, the district court must undertake an adequate inquiry to determine whether the alleged incident occurred and if so, whether it was prejudicial." *United States v. Bristol–Martir,* 570 F.3d 29, 42 (1st Cir.2009)(quoting *United States v. Barone,* 114 F.3d 1284, 1307 (1st Cir.1997)) (internal quotations and citations omitted). The "twin" goals of the court's inquiry are "to ascertain whether some taint-producing event actually occurred, and if so, to access the magnitude of the event and the extent of any resultant prejudice." *United States v. Bradshaw,* 281 F.3d 278, 289 (1st Cir.2002). Only if both a taint-producing event and a significant potential for prejudice are found must the court then "consider the extent to which prophylactic measures ... will suffice to alleviate that prejudice." *Id.* "The objective of this painstaking process is to ensure that the parties receive[ ] the trial by an unbiased jury to which the Constitution entitles them." *Id.* at 289–90 (quoting *United States v. Anello,* 765 F.2d 253, 258 (1st Cir.1985)).

A court's inquiry into a colorable question of jury contamination is not set in stone by any means, and no one particular method or another is required for the inquiry to be adequate.[18] Many circuit courts of appeal have made clear that trial courts have wide discretion over how to conduct such an inquiry. *See, e.g., Evans v. Young,* 854 F.2d 1081, 1084 (7th Cir.1988)(stating that trial courts have

---

18. For example, the First Circuit Court of Appeals has stated that "a trial judge may, but need not, convene a full blown evidentiary hearing," such as the hearing conducted as part of this Court's inquiry into previous claims of jury contamination. *U.S. v. Boylan,* 898 F.2d 230, 258 (1st Cir.1990) (internal citation omitted).

"wide latitude" in such inquiries); *United States v. Coleman*, 805 F.2d 474, 482 (3rd Cir.1986)(holding that a district court "has discretion to determine what procedures are necessary for a thorough examination of possible prejudice").

 Recognizing the necessarily idiosyncratic nature of an inquiry into jury taint, the First Circuit Court of Appeals has insisted only that a district court's investigation into jury taint be "methodologically sound" to protect a defendant's right to an unbiased jury. *Bradshaw*, 281 F.3d at 291 (citing *Boylan*, 898 F.2d at 259). In fact, the First Circuit Court of Appeals has stated that it "abjure[s] imposition of a rigid set of rules" for the method on jury taint inquiry because, first, a "kaleidoscopic variety of possible problems counsels in favors of flexibility," and, second, "jurors should not be subjected to undue impositions." *Boylan*, 898 F.2d at 258. To avoid such an imposition, the First Circuit Court of Appeals cautions that the scope of a judge's inquiry should be limited to "what is absolutely necessary to determine the facts with precision," *Id.* (internal citation and quotation omitted), provided that the judge utilizes "a suitable framework for investigating the allegation and gauging its effects, and thereafter spells out his findings with adequate specificity to permit informed appellate review ..." *Id.* (internal citations and quotations omitted). "Even if both a taint-producing event and a significant potential for prejudice are found through the investigation, a mistrial is still a remedy of last resort." *U.S. v. Lara–Ramirez*, 519 F.3d 76, 86 (1st Cir.2008) (internal citation omitted).

## DISCUSSION

To determine whether the jury in this case is now unable to reach an impartial verdict, the Court assessed whether the events described above were taint-producing, and, if so, the magnitude of the taint and any resulting prejudice.

The defendants' motions have offered the Court little by way of assistance. The barely six page motion for mistrial contains a legal analysis section of less than a full page of text (Docket No. 2193 at 4–5.) This section is the only section in the motion containing any citations to legal authority, and the authority presented to the Court merely recounts the standard for inquiry into jury contamination. There is no application of the standard to the facts of this case, nor any case cited for its particular relevance (or irrelevance) to the current situation. Worse, the motion states the standard, but then does not explain to the Court how the twin prongs of the standard's framework for analysis (showing a taint-producing event and showing a high magnitude of taint and resulting prejudice) are met by the facts of this case. The only argument in the motion at all is made by the analysis section's subheading title itself, "The incidents have created a risk that the jurors are prejudiced by facts not in evidence and unable to conduct a fair and impartial hearing." *Id.* at 4. The defendants fail, however, to state which facts not in evidence have prejudiced the jury.

Maysonet's motion for a new trial contains an argument section that is also less than one page of text (see Docket No. 2192 at 8–9) and which cites as authority only three cases, none of which is binding on this Court.[19] Like the motion for mistrial, Maysonet's motion fails to apply the legal standard to the facts of this case, instead making a generalized, olympian argument that "the irregularities in these proceed-

---

**19.** The Court need not consider the case law cited by Maysonet because the style of citation fails to identify properly the applicable hold-

ing in those cases or the relevance of each case to this one. Further, Maysonet specifies no pages numbers and gives no pincites to

ings, which are just starting, have been too many to guarantee that the decision of the jury will be an impartial one and that the Defendant will have a fair trial."[20] (*Id.* at 8.)

Despite the dearth of legal analysis from defendants' motions, the Court infers arguments where possible from those motions, and bases its analysis on those inferred arguments, the oral arguments made by attorneys during trial, the Court's independent review of relevant legal authority, and the Court's own credibility determinations and findings following its extensive interviews with members of the jury.

## A. Taint

 There are three alleged instances of taint-producing events: (1) the effect of

---

guide the Court's review of those cases for relevant holdings. (*See* Docket No. 2192 at 8) It is not the job of this Court to ferret through randomly cited case law or to divine counsel's reasoning for citing to a particular case. The Court also wonders why defendant chooses to cite no case law from the First Circuit Court of Appeals that would bind this court, given that such case law is abundant.

20. As an example of the "irregularities" of this trial, Maysonet argues that "some of the jurors seem to have lied" during their interviews with the Court which "points to a lack of honesty and a lack of capacity to act as jurors." In support of his claim that because some of the jurors lied they must be found incapable to act as jurors, Maysonet cites strangely to a Fifth Circuit Court of Appeals case, *United States v. Collins,* 972 F.2d 1385 (1992). Although Maysonet merely cites to this case generally, providing neither a description of the relevant holding, its applicability to this case, or a pincite to assist the Court's analysis, the Court wishes to address squarely Maysonet's reliance on the *Collins* case because its holding actually contradicts Maysonet's argument.

In *Collins,* the defendants argued they were denied the right to an impartial jury because, during the jury *voir dire* prior to the commencement of trial, a soon-to-be jury member turned to the veniermember next to her and said the defendants "need[ed] to go ahead and plead guilty and we can all go home because they look guilty anyway." *Id.* at 1403. The parties in *Collins* wanted the Fifth Circuit Court of Appeals to apply an analysis set forth in *McDonough Power Equip. v. Greenwood,* 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984). To succeed in a motion for a new trial based upon jury misconduct under *McDonough,* a party must show (1) that the juror failed to answer a material question

honestly on *voir dire* and (2) that a correct response would have provided a valid basis for challenge for cause. *Collins,* 972 F.2d at 1403 (internal citations and quotations omitted).

The Fifth Circuit Court of Appeals declined the invitation to apply the framework in *McDonough,* stating that the *McDonough* framework was *not* applicable in the *Collins* case because it "implicitly presumes a case in which a juror concealed an objective material fact." *Id.* at 1403–4 (citing *United States v. Scott,* 854 F.2d 697, 699 (5th Cir.1988) (juror "concealed" the "material fact" that his brother was a deputy sheriff)). The Fifth Circuit Court of Appeals explained that in cases "like this one, where jurors may have made premature expressions as to guilt, we generally *defer to the district court's decision as to whether the defendant received a fair trial by an impartial jury ...*". *Id.* at 1404 (emphasis added). In a footnote, the Fifth Circuit Court of Appeals added that its "usual task, then, is to review the adequacy of the court's investigation and its ultimate determination that the defendant received a fair trial by an impartial jury." *Id.* at n. 35 (internal citations omitted). Finally, and crucially, the Court in *Collins* chose to affirm the district court's decisions to credit the errant juror's denial of making the alleged statement, to credit that juror's affirmation that she was unbiased, and to find that the defendants received a fair trial by an impartial jury. *Id.* at 1404.

Maysonet incorrectly advises the Court to find the jury incapable based on an unspecified holding in *Collins.* Upon an independent review of *Collins* by this Court, it is clear that Collins in fact states that "First, the district court must determine whether the juror actually made the statements in question," determination that "necessarily requires the court to judge the credibility" of those involved. *Id.*

the smoking incident [21] on the jury; (2) the cafeteria incident's effect on the jurors involved directly; and (3) the effect of the cafeteria incident on the jury as a whole. The Court finds that these incidents caused no taint-producing effect on the jury and, even if some taint occurred, its influence on the jury is negligible and causes no prejudice to defendants.

There is no doubt that the events themselves occurred. As to the first event, the effect of the smoking incident on the jury: there was definitely an incident in which a defendant's family member, Rosa, accused three members of the jury (the "smokers") of discussing the case, a matter which is now known among some members of the jury who were not smoking. As to the second event, the cafeteria incident's effect on the two involved jurors, the Court, crediting the accounts of Juror 31 and Juror 6, finds that two jurors perceived · that individuals they recognized as family members of defendants in this trial stared and laughed at them (the jurors) in the cafeteria. As to the third event, the effect of the cafeteria incident on the jury, members of the jury not involved in the cafeteria incident are now aware of that incident.

There is doubt, however, that any of these three events has tainted this jury. Although what may constitute a "taint-producing" event is highly case-specific, the facts of this case "distinguish it from matters where the probability of jury prejudice was intolerably great." *U.S. v. Boylan,* 898 F.2d at 261 (internal citations omitted). Some events so obviously interfere with a jury's impartiality that they are considered presumptively prejudicial. In *Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), the Supreme Court held that, "in criminal cases, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial." *Id.* at 229, 74 S.Ct. 450; *see also United States v. Lloyd,* 269 F.3d 228, 238 (3d Cir.2001) (presumption applies "when the extraneous information is of a considerably serious nature," such as "when a juror is directly contacted by third-parties").

The First Circuit Court of Appeals does not apply the *Remmer* presumption in cases where there is not "an egregious tampering or third party communication which directly injects itself into the jury process." [22] *Boylan,* 898 F.2d at 261.

---

**21.** The Court already ruled on January 25, 2010 that the smoking incident, itself, did not constitute grounds for a mistrial. The smoking incident is relevant for purposes of the current motion for mistrial and motion for new trial only to the extent that the three jurors involved in the smoking incident may have discussed that incident with other jurors and, if so, whether other jurors' awareness impacts the defendants' right to an impartial jury.

**22.** In *Boylan,* the First Circuit Court of Appeals compared cases in which the facts trigger a *Remmer*-type presumption of prejudice and facts that require a fair hearing but do not trigger a presumption: *"Compare United States v. Littlefield,* 752 F.2d 1429, 1432 (9th Cir.1985) (magazine article on tax cheating,

read in jury room during trial on. fraudulent tax scheme); *United States v. Perkins,* 748 F.2d 1519, 1534 (11th Cir.1984) (juror's remarks during deliberations to the effect that he knew defendant); *U.S. v. Howard,* 506 F.2d 865, 867 (5th Cir.1975) (juror's disclosure to other jurors that defendant had been in trouble previously) *with United States v. Uribe,* 890 F.2d 554, 560–61 (1st Cir.1989) (posttrial disclosure that juror had previous disagreement with one defendant not presumptively prejudicial as to other defendant); *U.S. v. Nazzaro,* 889 F.2d 1158, 1167–68 (1st Cir.1989) (newspaper story concerning corrupt police officers not presumptively prejudicial as to police officer defendant in unrelated case); *United States v. Porcaro,* 648 F.2d 753, 756–58 (1st Cir.1981) (no presumption of prejudice where newspaper pieces 'contained

"Put another way, the *Remmer* standard should be limited to cases of significant ex parte contacts with a sitting juror or those involving aggravated circumstances ..." *Id.* In this case, there is no such egregious tampering or significant ex parte contact, and the parties appear to agree that the standard set forth in *Remmer* is inapplicable; the Court therefore attaches no presumption of prejudice. Instead, the Court applies the above-described two-pronged inquiry analysis set forth by the First Circuit Court of Appeals in *United States v. Bradshaw.*

Even those taint-producing events deemed not severe enough to warrant a presumption of prejudice, but that have still provoked inquiry, establish much more obvious "taint" than the events here. Quite instructive is the case of *United States v. Tejeda*, 481 F.3d 44 (1st Cir. 2007), in which two members of a jury observed, and informed other members of the jury, an individual in the courtroom (who was identified as involved in the alleged drug conspiracy) make a "throat-slitting gesture." The First Circuit Court of Appeals upheld the district court's denial of a *Remmer* presumption, but acknowledged the event's taint-producing quality.

Here the three events alleged to taint the jury are much weaker than the throat-slitting event found by the First Circuit Court of Appeals in *Tejeda* to pose "risks" "considerably weaker" than those posed by the facts in a case where a juror received

an explicit death threat related to the case but told the court he could remain impartial, and the court therefore denied a mistrial. *Id.* at 53 (citing *United States v. Rodríguez-Ortiz*, 455 F.3d 18, 23 (1st Cir. 2006)). In other words, on a sliding scale of taint, the events here barely register: there is no allegation of a direct third party contact, no exposure to extrinsic information or evidence, no improper materials in the jury room, no direct coercion or bribery, no jury tampering, in short; there is no activity that, on its face, constitutes interference with the jury's ability to weigh the facts of the case fairly. The only interference possibly at play in this case is that which the defendants must strain to infer. The Court thus finds that, although the three events alleged to be taint-producing did indeed occur, they did not actually produce taint. The Court nevertheless assumes, in an abundance of caution and to assure the integrity of the trial, that the facts of this case do establish the possibility of taint and proceeds to examine the effect of the maximum taint possible from the activity in this case on the jury.

### B. Magnitude and Prejudice

Even assuming taint, the Court finds that any taint that occurred is minimal, and that defendants have suffered no prejudice as a result of the events described above. The prejudice alleged in this case [23] involves two risks almost identical

no prejudicial characterizations of appellant himself, his reputation, prior acts, arrests, or convictions, nor any speculation as to his guilt or innocence')." *Id.* at 261 (full citations added when necessary).

23. The Court summarized and restated the discombobulated description of the taint alleged by defendants from the defendants' motions. Without distinguishing between taint, magnitude, or prejudice, Maysonet argues that "some of the jurors fear the family mem-

bers," that at least one of the jurors did not tell the truth during the *voir dire* proceedings, that Juror 31 is biased against Maysonet's wife "because [he/she] felt threatened by her and because [he/she] identifies her as the one who accused her before the Court of not following the Court's orders," and, therefore, "there is fear and animosity between [Juror 31] and Mrs. Rosa and, consequently, Mr. Maysonet-Soler." Maysonet claims that "some of the jurors seem to have lied to the

to those found in the *Tejeda* case, in which two jurors perceived someone in the courtroom do a throat-slitting gesture, then reported the gesture to other jurors before disclosing it to the court. The risks in *Tejeda* are: "(1) a risk of a perception by a juror of an implicit threat from someone who might, in the juror's view, be associated with the defendant; and (2) the risk that this "threat" might influence the juror's ability to impartially evaluate the evidence." *Tejeda*, 481 F.3d at 52–53. In this case, there is also the risk that the second-hand awareness of jurors about certain incidents has prejudiced their ability to deliberate fairly. Just as the court did in *Tejeda*, this Court weighs those risks "against the individual jurors' own statements that they were not so influenced and the trial judge's findings of fact that jurors could fairly and impartially reach a verdict." *Id.* at 53.

The Court examines first what, if any, prejudicial impact resulted from any second-hand awareness of the smoking and cafeteria incidents on members of the jury. It is clear that some members of the jury who were not involved directly in the smoking incident or in the cafeteria incident are now aware of those incidents to some degree. Only five members of the jury, aside from the three smokers, indicate any awareness of the smoking incident whatsoever. Only three members of the jury, aside from the two involved jury members, indicate any awareness about the cafeteria incident. Ironically, even those who may have been completely unaware of those incidents are likely aware now, by the simple virtue of having been asked directly by the Court on the defendants' request about their awareness of

various incidents during *voir dire*. The question is: does this awareness taint the jury's ability to deliberate fairly and come to an impartial verdict? The answer is no.

The jurors who were not involved in the incidents know only smatterings and fragments about them, and those jurors are generally unclear about any details and reveal through the content of their answers to questioning and through their demeanors during question that they are unsure about what exactly happened. Moreover, the jurors who know anything at all appear to only "know" something based on a combination of rumor, observation and conjecture: Juror 48, the juror most convinced that he/she was "in the know" about both the cafeteria and smoking incidents, admitted that he/she *assumed* it was "Wilfredo's wife" who accused members of the jury of discussing the case because of conduct Juror 48 observed in the courtroom between "Wilfredo's wife" and a defendant; Juror 6 explained that he/she did not hear about the smoking incident directly, but *observed* the three smokers together smoking outside of the courthouse near a family member who often appeared in the courtroom, and *believed* that the family member was a wife of a defendant because Juror 6 *observed* Rosa on the opposite side of the courtroom from where she (Rosa) usually sat; although Juror 49 heard from the smokers that "nothing really happened," he/she then *noticed* that the smokers were all called into chambers and *"imagine[d]* it was—because I saw them when they stayed [to smoke]." (Emphasis added.)

At absolute *worst*, one or more of the three smokers involved in the smoking in-

---

Court as to the above events" which "points to a lack of honesty and a lack of capacity to act as jurors." The remaining defendants' motion for mistrial argues that the jurors "feel intimidated and threatened by the enu-

merated incidents and that they had discussed the incidents among themselves, in clear violation of the court's instructions." As earlier stated, the motion claims that the jurors are prejudiced by facts not in evidence.

cident told one or more of the uninvolved jurors that a defendant's family member raised an allegation that the smokers were discussing the case and that the smokers were then called into chambers to converse privately with the Court. The Court disagrees with Maysonet, however, that the fact that uninvolved jury members acknowledged being aware of the smoking incident, or even recalled that one of the smokers discussed the incident, leads inevitably to the most damning conclusion—that the three involved jury members discussed the incident or their discussion about the smoking incident with the Court with other members of the jury.

These jury members spend each day together from the opening of the day, around 9:00 a.m. to the end of the day, sometimes later than 5:00 p.m. in the jury room, the jury box, or elsewhere in or near the courthouse. If one of the jury members uses the bathroom, the other members of the jury are aware of it. It is inevitable that when the three smokers were called to chambers to meet with the attorneys and the Court, the other members of the jury would notice and ask questions. It is highly probable that the three smokers had to field any inquiries regarding their trip to chambers for *voir dire* out of the jury room. It is also probable that the CSO fielded inquiries as well, and that his inquiry as to who smoked prompted speculation and questioning in relation to who then left the jury room for *voir dire*. These are the realities of jury rooms and the realities of human nature.

Although the Court instructed the three smokers not to discuss the *voir dire,* and although those three jurors later testified that they did not discuss the *voir dire* proceedings, and although other jurors claimed they heard about one or the other incident from one of the smokers, it does not follow that jurors were lying to the Court or that the smokers are incapable of following the Court's instructions. Instead, the Court finds that the smokers believed they did not discuss the in camera proceedings, even if what happened is that one or more of the smokers discussed with fellow jury members in vague terms that an incident occurred. All that is clear from the record is that five jurors are aware through an assemblage of their own perceptions and rumors, perhaps some from the smokers themselves, that something happened.

What is crystal clear and most important in the Court's determination of prejudice is that all of those five jurors, as well as the three smokers themselves, stated unequivocally that their ability to deliberate fairly and to render an impartial verdict was uncompromised.

The same basic analysis, and conclusion, holds true for the effect of the cafeteria incident on the non-involved jury members. The three members of the jury who learned something second-hand about the incident harbor no apparent bias towards any of the defendants, and all have affirmed their ability to remain impartial.

The Court next discusses the possibility that a juror perceived an implicit threat from someone who might, in the juror's view, be associated with the defendant and that this "threat" might influence the juror's ability to evaluate the evidence impartially. The defendants argue that jurors now feel "intimidated" and "threatened" by the enumerated events. The only jurors articulating any feelings of intimidation or discomfort were the two jurors involved in the cafeteria incident, Jurors 6 and 31, and Juror 48, who claimed to have discussed both incidents with Juror 31. The defendants exaggerate and misinterpret the statements made by these jurors to draw the inference that

the jurors now feel threatened. The two jurors directly involved in the incident felt more uncomfortable than threatened and, regardless of the magnitude or character of those feelings, the feelings were triggered not by fear of the defendants or their family members, but by concern that the Court would take action against them (the jurors).

When questioned by the Court as to how he/she felt following his/her experience, Juror 31 stated he/she did not pay any attention to the women in the cafeteria and was "not scared" but "didn't want any trouble." To follow up on Juror 31's statement, the Court *itself* introduced the word, "threatened," asking Juror 31 specifically if he/she felt threatened by what had happened. Juror 31 said, "sort-of," then when the Court used the word "uncomfortable," agreed that he/she felt more uncomfortable than threatened. The second juror involved in the cafeteria incident, Juror 6, stated, again in response to the Court's own use of the word "threatened," that, yes, he/she felt threatened, "a little bit, because we are, like, taking out lunch and they was—looking at us."

Crucial to the Court's assessment of Juror 31's and Juror 6's characterizations of their feelings, whether they felt uncomfortable at best or threatened at worst, are the comments made by those jurors that helped the Court understand the basis for those feelings. Juror 31 stated on February 2, 2010, in response to the Court's query as to his/her ability to remain impartial, "Yeah, I just don't want any trouble because she was the one who—who said that I was talking about the case at first ... when I was smoking, so I don't want her to bring it up first, then I ... So that's why I told [the CSO]." During *voir dire* proceedings the following day, with all attorneys present, Juror 31 was recalled at the request of attorneys to probe further

into her perceptions of the two incidents. When asked by the Court what he/she had meant the prior day about not wanting any "trouble," Juror 31 explained, "Like, I don't know ... trouble like—make—say something that is false, or something ... Like what had happened ... That they were saying I was talking about the case, and I wasn't ... Like somebody from the family said I was talking about the case ... they were saying that I was talking about the case and I wasn't ... For me, that's trouble ... Because I wasn't talking about the case, and then I have to come here and say no." Juror 6 also told the Court during the February 3, 2010 follow-up *voir dire* that he/she believed one of the persons in the cafeteria was a defendant's wife because, "that's the one that had the problem with the three persons, that they were smoking."

These statements reveal that, although the jurors involved in the cafeteria incident clearly felt something was amiss because they opted to inform the CSO, and, hence, this Court, about their experience in the cafeteria on February 2, 2010, the basis of their discomfort stemmed not from a concern about "trouble" in the physical sense, such as could be inferred from a throat-slitting gesture, but "trouble" in the getting-in-trouble-with-the-authority sense. In other words, because of Juror 31's earlier experience of having to appear before the Court to answer questions about his/her conduct following the smoking incident, (and perhaps his/her heightened sensitivity to surroundings in the courthouse as a result), Jurors 31 and 6 appear to have preemptively informed the Court of their experience in the cafeteria to protect themselves in the event that members of the family might make something of that interaction. This Court likens the actions and reactions of Jurors 31 and 6 to those of persons who attempt to document every little thing pertaining to a potentially con-

flictual situation in order to "cover their asses." Ironically, the actions of Jurors 31 and 6 prompted this inquiry and a reopening of the issue of jury contamination.

Defendants have not explained or demonstrated to the Court how they are prejudiced by the effects of the cafeteria incident on Juror 31 and Juror 6 other than saying that those jurors feel intimidated or threatened. Because the Court has found any threat perceived by the involved jurors to be based on those jurors' concern of getting in trouble with the Court, rather than fearing the defendants or the defendants' family, the only possible way that the incident could have prejudiced the defendants is if Juror 6 and 31 will now harbor bias against the defendants as a result of any perception that members of defendants' families will attempt to get members of the jury in trouble. The Court finds this sort of bias unlikely.

Most importantly, both Juror 31 and Juror 6 stated unequivocally that they could deliberate fairly and render an impartial verdict, and they stated their ability to do so on various days of questioning and in response to many forms of questioning. Likewise, Juror 48, who asked Juror 31 to explain why he/she was going to speak with the Court, affirmed confidently and unequivocally to the Court that he/she would be able to proceed impartially notwithstanding any knowledge he/she discovered about any of the incidents or rumors of such. The Court credits these jurors' statements.

In sum, the Court's inquiry reveals that, even were any of the three events deemed "taint-producing", none of the events that have occurred in this case renders the jury incapable of proceeding fairly and without prejudice to these defendants.

First and most critically, each and every member of the jury, including alternates, and including those jurors directly involved in the incidents, and including those jurors articulating any sense of intimidation or discomfort for any reason, has affirmed his or her ability to deliberate fairly and reach an impartial verdict. As the First Circuit Court of Appeals has explained, "jurors' assertions of continued impartiality, favorably appraised by the court, comprise testimonials that are not inherently suspect, for a juror is well qualified to say whether he has an unbiased mind in a certain matter." *Boylan,* 898 F.2d at 262 (internal quotation omitted); *see also United States v. Angiulo,* 847 F.2d 956, 964 (1st Cir.), *cert. denied,* 488 U.S. 928, 109 S.Ct. 314, 102 L.Ed.2d 332 (1988) (trial court may rely on juror's statement of continued impartiality).

Secondly, were the Court to find jury bias each and every time that a juror felt scrutinized and even "targeted" by persons attending a public trial, the justice system would have no unbiased jurors. Individual members of the jury arrive to the Court with varying degrees of confidence and varying thickness of skin. They arrive with various experiences and backgrounds, expectations, prejudices, and affinities. The fact that some jurors feel self-conscious, uncomfortable, or even intimidated by the presence of family members, friends or other members of the public in the courtroom or elsewhere is to be expected. Opening trials to the public means that there will almost certainly be some sort of "relationship" between the jurors and the individuals attending trial: these jurors relate each day to defendants, attorneys representing parties, interpreters, U.S. Marshals, courtroom staff, courtroom security and the judge. The jurors form impressions about all of these individuals, and some of those impressions will be more favorable than others. So long as the trial is open to the public, no amount of Court instruction or preventative measure

can prevent eye contact or other forms of non-verbal communication.

Jurors are not stupid. They know that family members and other courtroom visitors may be hoping for a defendant's acquittal. It is natural and predictable and not at all inappropriate that jurors feel looked at or scrutinized by individuals in the courtroom—they *are* being looked at. Jury members are the decision-makers in these cases, and they know that they will receive a lot of attention from those in the courtroom, including attention from the judge, attorneys, defendants, and members of the public. A jury is not contaminated by this kind of predictable and harmless attention by third parties; a jury is considered contaminated by third-party contact only if the effect of that contact would prevent the jury from deliberating fairly or impartially.

The Court trusts that individuals sitting on this and other juries can distinguish generally between the attitudes of those in the courtroom who may direct toward the jury a glare in frustration, a smile in relief, an impatient sigh, or any number of natural reactions to the events unfolding in the courtroom, from the evidence they are permitted to consider during deliberations.

Finally, were the Court to find bias whenever a juror felt scrutinized by members of the public attending trial, it would invite members of the public who have an interest in ending the trial to try to contact members of the jury intentionally, whether by accusation of misconduct, eye contact, or otherwise. The Court must distinguish between contact that endangers the integrity of the process and conduct that is either natural in the course of public trial or conduct initiated by members of the public to frustrate the trial proceedings outright. Defendants have the right to a jury that can conduct deliberations based only on the evidence and can render an

impartial verdict; they do not have the right to a jury so lily-pure that jurors would have to be blind or stupid to be considered untainted.

It is because of the realities of trial, the trust of this Court in the collective and individual wisdom of members of juries, and the credibility of the jurors' statements in this case that the Court has found no prejudice resulting from the cafeteria incident itself nor from the effect of either the smoking incident or the cafeteria incident on the jury. The court concurs with the Supreme Court's observations in *Smith v. Phillips,* 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982):

> ... due process does not require a new trial every time a juror has been placed in a potentially compromising situation ...; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Such determinations may properly be made at a hearing like that ordered in *Remmer.* . . .

Although the Court considers the possibility of jury contamination very seriously, the record shows clearly that what has occurred in this case among members of the jury and between members of the jury and third parties has not violated defendants' due process, nor caused contamination hampering the jury's ability to deliberate fairly or to render an impartial verdict.

## C. Prophylactic Measures

Although the Court has found no prejudice resulting from the events described above, it has enacted various prophylactic

measures to assure this case proceeds fairly: (1) the Court admonished each individual jury member during the *voir dire* proceedings in chambers to refrain from discussing the *voir dire* interview with anyone; (2) the Court ordered the jury to be served lunch in the jury room; (3) the Court ordered any member of the jury wishing to go outdoors for any reason to be taken only to the Court's back parking lot; (4) the Court ordered jury members to use only the employee entrance located in the federal building (a building adjacent and connected to the courthouse); (5) the Court ordered jury members, after entering the federal building, to meet in the jury assembly area from where they will be escorted to the jury room; and (6) the Court issued a warning from the bench to members of the public that contacts with any jury member will not be tolerated. After enacting these prophylactic measures to ensure that the jury remains capable of rendering an impartial verdict, the Court stated that it would not hesitate to enact further prophylactic measures if needed.

## CONCLUSION

For the reasons expressed above, based on this Court's inquiry into jury contamination, the defendants' motions for new trial (Docket No. 2192) and mistrial (Docket No. 2193) are hereby **DENIED.**

**IT IS SO ORDERED.**